## INLAND FINANCE CO. v. STANDARD SALMON PACK-ERS, Inc., et al.

First Division.   Juneau.   February 5, 1924.

No. 2144–A.

**1. Corporations ⬅668(14)—Process—Service by Publication.**

Where the affidavit for publication and service of summons states in positive terms that a defendant is a corporation, having its principal place of business at 82 Wall street, New York City, and that said corporation has no officer, nor agent, nor representative of any kind in the territory of Alaska, nor any place of business nor office within said territory, and that personal service of summons cannot be had on it, they are sufficient, and exclude every condition in which personal service under paragraph 1 of section 878, Compiled Laws, could be made on a private corporation.

⬅See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. Corporations ⬚⟹668(14)—Process—Service by Publication.

Where it further appears from the record that the United States marshal made a return on the summons to the effect that, after diligent search and inquiry, he was unable to serve the summons on the defendant corporation, for the reason that it 'is a foreign corporation not doing business in the territory of Alaska, and has not filed its articles of incorporation in the territory of Alaska, and has no officer, agent, nor place of business in said territory, this return, with the affidavit of the attorney for the plaintiff to the same effect, brings the case within Marx v. Ebner, 180 U. S. 314, 21 S. Ct. 376, 45 L. Ed. 547, which is decisive on the point.

3. Time ⬚⟹6—Process—Service by Publication.

Publication of summons was made six times, once each week, beginning December 17, 1921, and ending January 21, 1922. The publication of January 21 carried the publication forward to the close of January 27, and at any time after 30 days from January 27 the default of the defendant was liable to be entered. The default was not entered until the 24th day of May following. Held, a full compliance with the statute.

4. Process ⬚⟹104—Succinct Statement of Relief Demanded in the Summons Published.

Where the summons contains in a general way a succinct statement of the relief demanded in the complaint, and reasonably shows the nature and purposes of the action and the relief demanded, it is sufficient to sustain the service. It is sufficient if it, in a reasonable degree, tends to carry information to interested persons that the action affects their rights and the nature of the relief sought.

5. Judgment ⬚⟹142—Opening or Vacating within One Year for Cause.

Where the assignee of a defendant, against whom judgment was entered on service by publication, appears in the case within one year, and moves to have the judgment opened for the presentation of answer and defense, held, such an application is not mandatory, but there must be good cause shown before the court would be authorized to set aside the judgment and allow the defendant to defend the action. The phrase "good cause shown," which is necessary to set aside a judgment, involves two propositions: (1) A showing why the defendant had not appeared within the time allowed for appearance and defense of the action; and (2) whether or not the defendant applying had any good defense to the action itself. If the defendant had no notice of the action, or through mistake or unavoidable circumstance, or by mistake, was prevented, without his fault, from defending the action, it would be a good cause to set aside the judgment and allow him to defend, providing, with the showing of such a nature, there is presented a valid defense to the action. If there was no valid de-

⬚⟹See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

fense presented to the court with the showing as to why defendant had not appeared, it would be a futile thing to set aside the judgment or decree.

**6. Lis Pendens ⬧⟹24(1)—Assignee Bound by Judgment.**

Where an assignee became such after the commencement of a suit against the assignor, and subsequent to judgment applies to open the judgment and defend, *held*, he succeeded to the rights of the assignor who was served with process, stands in his place, and is bound by the judgment.

**7. Execution ⬧⟹219—Woods and Forests ⬧⟹8—Judicial Sales—United States Forest Service Lands Held under Permits.**

Where the United States marshal sold property of a cannery located on Forest Service reservation, to which the cannery corporation had a permit to occupy the land under revocable license, on motion to vacate the sale because the land was sold as personal property, *held*, the permit does not grant any estate in the land; it is revocable at the will of the Forest Service, and is not assignable, except on approval of the government officers and on such terms as they may prescribe; the permit is merely a license, and, if it could be sold at all under execution, it should be sold as personal property, and the purchaser would take it subject to the approval of the Forest Service.

**8. Fixtures ⬧⟹24—Temporary Buildings on Forest Service Reservations Held to be Personal Property.**

It is a well-settled rule that erections made under a lease or license for a temporary purpose, and not erected as permanent accessions to the freehold, but erected under an understanding that the same may be removed, and made by the tenant for his own benefit and not in fulfillment of his obligation to his lessor, do not become a part of the freehold, but are to be regarded as personal property.

**9. Navigable Waters ⬧⟹36(3), 37(1, 5)—Tide Lands—Rights of Occupant.**

Land below mean high tide is land held by the United States in reserve for the benefit of the future state, and, while it may be disposed of by Congress under grant, it is not within the general classification of public lands of the United States. While reserved for the benefit of the future state, it has always been the policy of the government to permit such lands to be occupied for the purpose of trade, commerce and navigation. There is, therefore, an implied license by the United States to occupy such lands for the purposes aforesaid; but this license is revocable at the pleasure of the government, and such occupancy gives no right or estate in and to the lands themselves. The occupant occupies the land at the will of the government, and at the will of the United States he will become a mere trespasser and may be removed without notice.

⬧⟹See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

10. **Fixtures ☞24, 31—Wharves Across Tide Lands—Rights of Occupants.**

> The dock, having been erected on land and over waters (held in trust by the United States and reserved for the benefit of the future state) by the Standard Salmon Packers under an implied license from the United States for the purpose of trade, is not a part of the real estate, since there is an implied agreement by the United States that such structures may be removed at the will of the temporary occupant.

The Inland Finance Company, a Washington corporation, on December 12, 1921, as assignee of the mortgagee, commenced this action for the foreclosure of a mortgage executed by the defendant Standard Salmon Packers, Inc., incorporated under the laws of the state of Washington, in favor of the United Finance Company, a Washington corporation, upon certain property situated at Sunny Cove, on Tenakee Inlet, Alaska.

The mortgage was executed to secure the payment of a promissory note for the sum of $30,000, payable in installments.

Personal service was had on the defendant mortgagor, and default for nonappearance was entered against it on January 14, 1922.

The defendant S. G. Blowers & Co., a foreign corporation, was made a party to the action as holder of a second mortgage lien on the property mentioned, and service was made on it by publication and mailing of summons. The publication was in the Alaska Daily Empire, commencing December 17, 1921, and each week thereafter to January 21, 1922, being six publications, and summons was mailed to the defendant S. G. Blowers & Co., at 84 Wall street, New York City, on December 16, 1921. The order for publication of summons was made upon the affidavit and return of the United States marshal that the defendant S. G. Blowers & Co. could not be found within the territory of Alaska on December 16, 1921.

On February 14, 1922, a supplemental complaint and petition for the appointment of a temporary receiver were filed by the Inland Finance Company, the plaintiff in this action, and a temporary receiver of the property of the defendant was appointed on February 21, 1922.

On May 26, 1922, an order of default was entered against S. G. Blowers & Co., and on June 17, 1922, a decree of foreclosure and order of sale of the property described in the mortgage were entered.

---

☞See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

On January 6, 1923, one Martin R. Nissly moved to set aside the judgment of foreclosure and vacate the order of sale for reasons stated, and the matter was brought on for hearing on January 2, 1924.

R. E. Robertson, of Juneau, for movant.
R. L. Evans and H. L. Faulkner, both of Juneau, opposed.

REED, District Judge. The movant, Martin R. Nissly, alleges in support of his motion that he is assignee of the claims of the defendant S. G. Blowers & Co. against the defendant Standard Salmon Packers, Inc., and also assignee of the second mortgage executed June 12, 1920, by the Standard Salmon Packers, Inc., to S. G. Blowers & Co.; that no personal service of summons was made in the foreclosure proceedings in this case on S. G. Blowers & Co., and that said S. G. Blowers & Co. had a good defense to the action, in that the defendant Standard Salmon Packers, Inc., did not owe the plaintiff the sum of $30,000 as alleged in the complaint, or any sum in excess of $20,000; and that the foreclosure proceedings were fraudulent and collusively made between the plaintiff and the defendant, the Standard Salmon Packers, Inc., for $38,889.14, with intent to defraud the creditors of Standard Salmon Packers, Inc., and particularly S. G. Blowers & Co. from setting up its mortgage, and depriving it and its assignee from realizing anything thereon; that the property covered by the mortgage so foreclosed was bid in by the Inland Finance Company for the sum of $15,000, which was an entirely inadequate sum; and the movant, as assignee of S. G. Blowers & Co., was thereby prevented from redeeming the property under his second mortgage, etc. Also at the same time, the movant Nissly moved to vacate and set aside the sale on the ground that the United States marshal making the sale had sold real and personal property in one lump or parcel for $15,000 and did not sell the real property separate and apart from the personalty; that no notice of sale was published as required by law for the sale of real estate, and the same was not sold at the courthouse as required by law; that the personal property was not offered for sale in separate parcels.

On January 26, 1923, Nissly filed a supplemental motion, covering practically the same points as covered in the original application, with the additional grounds of a challenge as to the suf-

ficiency of the showing for the issuance of an order for service by publication, and a challenge to the published summons itself.

Considering the first question, that of the jurisdiction of the court over the defendant S. G. Blowers & Co., counsel for Nissly contends: (1) That there is not sufficient showing for the issuance of an order for service by publication. (2) That the summons was not published for the length of time required by law; i. e., for a period of six consecutive weeks. (3) That the summons as published was insufficient notice.

As to the first contention, the affidavit for publication and service of summons states in positive terms that S. G. Blowers & Co. is a corporation having its principal place of business at 82 Wall street, New York City, and that said corporation has no officer, nor agent, nor representative of any kind in the territory of Alaska, nor any place of business nor office within said territory, and that personal service of summons cannot be had on it. These allegations are not made "upon information and belief," but positively, and are sufficient, and they exclude every condition in which personal service under paragraph 1 of section 878, Compiled Laws, could be made on a private corporation. See Knapp v. Wallace, 50 Or. 348, 92 P. 1054, 126 Am. St. Rep. 742; Pike v. Kennedy, 15 Or. 420, 15 P. 637; Bank v. Richardson, 34 Or. 518, 54 P. 359, 75 Am. St. Rep. 664; McDonald v. Cooper (C. C.) 32 F. 746, 749; Ballew v. Young, 24 Okl. 182, 103 P. 623, 23 L. R. A. (N. S.) 1084.

It further appears from the record that on December 16, 1921, the United States marshal for the Second division of Alaska made a return on the summons issued in the case, to the effect that after diligent search and inquiry he was unable to serve the summons on the defendant S. G. Blowers & Co., a corporation, for the reason that S. G. Blowers & Co. is a foreign corporation not doing business in the territory of Alaska, and has not filed its articles of incorporation in the territory of Alaska, and has no officer, agent, nor place of business in said territory. This return, with the affidavit of the attorney for the plaintiff to the same effect (i. e., that personal service cannot be made on the defendant corporation S. G. Blowers & Co. within the territory of Alaska, and that the office and place of business of S. G. Blowers & Co. is at No. 82 Wall street, New York City), brings the case squarely within the decision of Marx v. Ebner, 180 U. S. 314, 21 S. Ct. 376, 45 L. Ed. 547, which is decisive on the point.

Under the foregoing decision of the United States Supreme Court, the affidavit and the return of the United States marshal together are sufficient for the issuance of an order for the publication of summons.

The second contention, that the summons was not published once each week for a period of six successive weeks, as required by section 880 of the Compiled Laws, is, in my judgment, without virtue.

Counsel for movant bases his contention that there was insufficient publication on Early v. Doe, 16 How. 610, 14 L. Ed. 1079. The authority in this case cannot be questioned as to the facts therein stated; but the case is not in point herein.

The publication in the case at bar was made six times, once each week, beginning December 17, 1921, and ending January 21, 1922; the publication of January 21 carried the publication forward to the close of the day January 27, and at any time after 30 days from January 27 the default of the defendant was liable to be entered. In truth and in fact, in this case the default was not entered until the 24th day of May following. Publication for six weeks, according to the authorities, is a full compliance with the statute as to the number of publications required. See Wilson v. Northwestern Mutual Life Ins. Co. (C. C. A.) 65 F. 38; Ann. Cas. 1917B, notes page 209 et seq.

The third contention of counsel is that the published notice of summons is insufficient, in that it did not comply with the sixth paragraph of section 879, Compiled Laws, by giving a succinct statement of the relief demanded. The summons as published in this regard is as follows:

"And if you fail to so appear and answer, for want thereof plaintiff will take judgment against you for the sum specified in the complaint, and will apply to the court for the relief demanded therein, a copy of which complaint is herewith served upon you, and which relief is for the foreclosure of mortgage held by plaintiff upon the cannery site and cannery property, etc., of the defendant Standard Salmon Packers, Inc., at Tenakee, Alaska, in the sum of $30,000, as more fully set forth in the complaint on file in this cause, which is herewith served upon you, and to which reference is hereby made."

This statement is somewhat loose and defective, yet it comprehends in a general way a succinct statement of the relief demanded in the complaint, and is, in my judgment, sufficient, as it reasonably shows the nature and purpose of the action and the relief demanded.

According to the authorities, it is sufficient if it, in a reasonable degree, tends to carry information to interested persons that the action affects their rights and the nature of the relief sought. See 21 Ruling Case Law, 1297; Bewick v. Muir, 83 Cal. 368, 23 P. 389; Barndollar v. Patton, 5 Colo. 46; Freeman v. Paul, 105 Ind. 451, 5 N. E. 754; Hickman v. Chambers, 10 Iowa, 301; Loungeway v. Hale, 73 Tex. 495, 11 S. W. 537; De Corvet v. Dolan, 7 Wash. 365, 35 P. 72, 1072.

Further, it appears from the undisputed record in this case that the defendant was served with a copy of the complaint in the action referred to in the summons, by the mailing of the same to it at its principal place of business at No. 82 Wall street, New York City, and that, pending entry of default and decree of foreclosure, the president of the corporation, S. G. Blowers & Co., the assignor of the movant, discussed the foreclosure of the mortgage and the relief demanded in the complaint with one of the attorneys for the plaintiff, and stated that the defendant S. G. Blowers & Co. had no defense to the action. In this connection, see Calderwood v. Brooks, 28 Cal. 151.

It follows, therefore, and I am of the opinion that the published notice was sufficient, especially in view of the fact that the complaint itself was in the possession of the president of the defendant corporation S. G. Blowers & Co., and that the court had jurisdiction to enter default and decree against it.

But the movant, Nissly, as assignee of S. G. Blowers & Co., invokes section 881 of the Compiled Laws, providing that the defendant or his personal representative, on application and for good cause shown, may be allowed to defend within one year after entry of judgment on such terms as may be just. The claim is made by him that under this section, where service is made by publication of summons, and defendant or his representative apply to the court within one year from entry of judgment or decree, to defend, it is mandatory on the court to set aside the judgment and allow the defense.

This view cannot be sustained under our statute, for the reason that the statute provides that the court may, upon good cause shown, allow the defendant or his representative to defend within one year after entry of judgment. Therefore, under the statute, there must be good cause shown before the court would be authorized to set aside the judgment and allow the defendant to defend the action. The phrase "good cause shown," which is

necessary to set aside a judgment, involves two propositions: (1) A showing why the defendant had not appeared within the time allowed for appearance and defense of the action; and (2) whether or not the defendant applying had any good defense to the action itself.

If the defendant had no notice of the action, or through misfortune or unavoidable circumstance or by mistake was prevented, without his fault, from defending the action, it would be good cause to set aside the judgment and allow him to defend, providing, with the showing of such a nature, there is presented *a valid defense to the action.* If there was no valid defense presented to the court, with the showing as to why defendant had not appeared, it would be a futile thing to set aside the judgment or decree.

It follows, then, that it will be necessary to consider first the showing made by Nissly, as assignee of S. G. Blowers & Co., the defendant in the action, as to why S. G. Blowers & Co. did not appear and make a defense to the action within the time allowed by law.

It appears from the affidavit of Nissly that he is the assignee of the mortgage made to S. G. Blowers & Co. This affidavit was sworn to some seven months after the entry of the decree. It, however, nowhere appears therein, or in any of the papers submitted on Nissly's behalf, when he became such assignee, except it appears incidentally that he purchased all the claims of S. G. Blowers & Co. from the receivers of S. G. Blowers & Co. It must be considered, then, that he became such assignee after the commencement of this action of foreclosure; and, if so, he succeeded only to such rights as S. G. Blowers & Co. had. If S. G. Blowers & Co. was the record holder of the mortgage, and was duly served with summons by publication, and a default was properly entered, and decree of foreclosure foreclosing the equity of Blowers' second mortgage was duly entered, such foreclosure would conclude any rights which Nissly had, as assignee, to the same extent as it would conclude the rights of S. G. Blowers & Co., the original mortgagee. If Nissly was the assignee of the S. G. Blowers & Co. mortgage before the initiation of the foreclosure proceedings in this action, or even before the decree was entered, it is to be presumed that he would have so shown in the affidavit, and, in the absence of such showing, the

presumption is that he became such assignee subsequent to the entry of the decree.

The showing, then, as to why an appearance and defense to this action was not made within the time allowed by law, is not whether Nissly, as representative of S. G. Blowers & Co. by virtue of being assignee of the Blowers mortgage, used due diligence, but whether S. G. Blowers & Co. used due diligence, or was by accident, mistake, or want of knowledge prevented from appearing.

I have very carefully gone over the record and the showing of the applicant, Nissly, and find no showing made as to why S. G. Blowers & Co. did not defend the action within the time allowed by law; but, on the contrary, the affidavit submitted on behalf of the plaintiff not only shows that S. G. Blowers & Co. were cognizant of the action, but that S. G. Blowers, who in his affidavit of merits states that he is president of S. G. Blowers & Co. and also treasurer of the Standard Salmon Packers, Inc., mortgagor defendant, had a copy of the summons and complaint, and stated that he guaranteed the note securing the mortgage attacked by Nissly herein, and that he had no defense to the action. (See affidavit of H. L. Faulkner.) There is no dispute, as far as showing is made, but that S. G. Blowers & Co. had knowledge of the action; and as far as appears from the testimony S. G. Blowers & Co. did not intend to defend the action, although regularly served. It further appears from the affidavit of S. G. Blowers himself that he, as president of S. G. Blowers & Co. and as treasurer of the Standard Salmon Packers, Inc., was well acquainted with the financial affairs of the Standard Salmon Packers, Inc., and also was well acquainted with all transactions with reference to the $30,000 note, the failure of the consideration of which is the basis of the application for setting aside the decree, and that he (S. G. Blowers) guaranteed the payment thereof.

If there was in the record any reasonable showing why the default should be set aside or the judgment vacated, I would be inclined to do so, but it appears to me the defendant S. G. Blowers & Co. was duly and regularly served with process in this action, was acquainted with the nature of the action and of its pendency, and there is no excuse shown in the record why he did not appear and defend the action within the time allowed by law. There is, therefore, no showing why the default judgment

should be set aside, and I must for that lack of showing decline to do so.

I have also considered the answer and cross-complaint of the assignee, Nissly, of the S. G. Blowers & Co. mortgage, tendered with the motion to vacate the judgment. The answer consists generally of denials based on "want of knowledge or information," except there is a specific denial that the consideration for the note of $30,000 was for any greater sum than $20,000. This is a defense of partial failure of consideration of the note. The affirmative answer alleges upon information and belief a partial want of consideration of the note, and alleges in general terms fraud and collusion between Wettrick, the payee of the note, the United Finance Company, and the Inland Finance Company.

While it is not usual, or generally proper, to consider testimony in the way of affidavits on the merits of a defense submitted on an application of this nature, yet in view of the general allegations of fraud and collusion on the part of the plaintiff and its assignors, and the fact that both parties to the controversy have submitted affidavits as to the good faith of the officers of the Standard Salmon Packers, Inc., the United Finance Company, and the Inland Finance Company, I deem it well to call attention to the facts as they appear of record.

On April 1, 1920, the Standard Salmon Packers, Inc., executed a note of $30,000 to F. J. Wettrick, its president. On the same day Wettrick, with one Crawford and one Tenneson, guaranteed the payment of the note and discounted it for the sum of $27,000 with the United Finance Company, a corporation having its principal place of business in Seattle, Wash.; and as a consideration of discounting the note, and for further security for the payment thereof, the United Finance Company required that the Standard Salmon Packers, Inc., should execute a mortgage in its favor, covering the cannery plant of the Standard Salmon Packers, Inc., for the principal sum of the note. This mortgage was given on the day of the execution of the note, April 1, 1920, and the United Finance Company turned over to the Standard Salmon Packers, Inc., the sum of $27,000, being the amount for which the note had been agreed to be discounted.

This note is the same note which it is alleged by the movant, Nissly, both in his answer and in his affidavits, was given to Wettrick for the consideration of $20,000.

The facts as disclosed indicate that the note was executed and

delivered to Wettrick by the Standard Salmon Packers, Inc., for the purpose of discounting in the market, and was not executed or delivered to Wettrick in payment of any indebtedness owed to him by Standard Salmon Packers, Inc., as alleged in the affidavit of Blowers and by the movant, Nissly.

It further appears that on June 20, 1920, and a month and a half after the discounting of the note of the Standard Salmon Packers, Inc., by the United Finance Company, a mortgage was executed by the Standard Salmon Packers, Inc., to S. G. Blowers & Co., for the sum of $21,400.. This mortgage was assigned to Nissly, the movant herein, by the receivers of S. G. Blowers & Co. On August 16, 1920, S. G. Blowers & Co., the assignor of the movant and the mortgagee in the second mortgage, in consideration of an extension of time for the payment of the balance due on the note of $30,000 above referred to, guaranteed the payment of the balance due thereon, with interest, on or before November 1, 1920. This guaranty was a specific acknowledgment of the validity of the note by the second mortgagee, and in my opinion S. G. Blowers & Co. and its privies would be estopped from setting up the failure of the consideration of the note or fraud in its execution as against the plaintiff, the Inland Finance Company, to whom the note and mortgage were afterwards transferred. It is not necessary, however, to further discuss the facts as produced by the affidavits with reference to the proposed defense and cross-complaint, for the reason that there is no showing made why the default should be set aside.

### The Motion to Vacate the Sale.

The motion to vacate the sale is based upon the ground that the sale of the property was made as personalty, while it should have been made as real property, or at least that a portion of the property should have been sold as real estate.

It must be conceded that under our statute, which provides a different method for the sale of real property from that prescribed for the sale of personal property, if real estate is sold as personal property under execution, the sale is void. The question, therefore, in this case, is whether any of the property sold under the special execution or order of sale was real property. This is a mixed question of law and fact; unfortunately there is nothing in the record, or in the description in the mortgage, or

in the return of the United States marshal, from which it can be determined what is real property and what is personal property.

The mortgage, which is drawn as a real and chattel mortgage, describes the property:

"All property, both real and personal, now owned and all property hereafter acquired by said mortgagor, including: A certain leasehold or permit for a tract of land consisting of about forty-five (45) acres on the north shore to Tenakee Inlet, approximately four (4) miles east of the Tenakee post office, which land is more particularly described on the plat on file in the United States Forest Service office at Ketchikan, Alaska. Also a certain two-line salmon cannery located upon the above-described premises at said Tenakee Inlet, including cannery building 250x36 feet, two stories high, cannery dock, oil dock, warehouse No. 2, 300x40 feet, two stories high, warehouse No. 3, 100x36, two stories high, warehouse No. 1, 62x20, one story high, store and bunk house buildings, oriental quarters, and various houses and auxiliary buildings, all situated upon the above-described real estate at Tenakee Inlet, Alaska. Also all other buildings, of every kind and description, situated upon or adjacent to said above described premises. Also all machinery and equipment used or intended to be used in and about the operation of said cannery, including two (2) full lines Troyer-Fox machinery, five (5) retorts, power lacquer machine, power labeling machine, power lye tank and washer, iron chink, electric light and power plant, machine shop, fuel, oil, and distillate tanks; and all other machinery, equipment, and tools situated upon or adjacent to the above-described premises. Also the following floating property in the waters of said Tenakee Inlet or thereabouts in the territory of Alaska: Cannery tender Monaghan, registry number 208815, 25 tons net; cannery tender Owl, registry number 207151, 10 tons net; seine boat Anna L; seine boat Elida, registry number 202122, 10 tons net; pile driver Tenakee, 65 foot gins; three deck scows; 2 pot scows; 20 skiffs. Also all cans made up, including tops and boxes for the same, all lacquer salt, lye, coal tar, coal, wood, fuel oil, distillate, lumber of every kind and description, rope of all sizes, seine corks, seine leads, down haul chains, wire webbing, cotton webbing, wire cables, pile chains and piles, blocks, oars, small boats, camp and boat stoves, staples, etc., and a general stock of merchandise and all other cannery machinery, supplies, tools, and equipment owned by the party of the first part and wheresoever situated, together with all fishing boats, seines and fishing gear situated upon or adjacent to the above-described premises, or used in connection with the business of the vendor as heretofore conducted, together with all other personal property now owned by the vendor, save and except the fish packed by it in 1919 and its accounts and bills receivable. Also a water power and electric light system and all machinery, tools, and equipment, rights and properties whatsoever used in connection therewith. Also three fishing locations, identified in 1919 by territorial license numbers 143, 145, 146, with any other locations owned by the vendor, with all traps, floating traps, and other fishing appliances of every nature and kind whatsoever owned by the vendor."

The record shows that a permit or license to occupy certain land belonging to the United States within the Tongass Forest Reserve was issued by the supervisor of the Forest Service of the United States to the Tenakee Fisheries Company on November 8, 1918, for the purpose of canning salmon. These lands were surveyed, and contain about 45 acres, and are bounded on one side by the shore line of Tenakee Inlet. It is conceded that the permit or license so issued to the Tenakee Fisheries is the authority by which the tract of land under discussion is occupied by the Standard Salmon Packers, Inc., and that the Standard Salmon Packers, Inc., is successor in interest of the Tenakee Fisheries. The permit or license is revocable, and may be revoked at any time by the forest supervisor, and any transfer of the same is subject to his approval, and subject also to such conditions as he may impose at the time of the transfer.

It is provided in the permit that all structures placed on the land by the permittee may be removed by him within a reasonable period (to be determined by the Forest Service) after the abandonment, termination, or revocation of the permit.

The permit is for the use of the lands for the purpose of canning salmon, and possession is not exclusive as against the Forest Service, nor other uses of forest products; for the permittee has to grant a right of way to the Forest Service and users of forest products over the land.

The permit does not grant any estate in the land. It is revocable at the will of the Forest Service, and is not assignable except on approval of the government officers, and on such terms as they may prescribe, and the consideration for the permit may be changed by them to conform to terms prescribed for like permits in other localities.

I am clearly of the opinion that the permit is merely a license, and, if it could be sold at all under execution, it should be sold as personal property, and the purchaser would take it subject to the approval of the Forest Service.

While there is no showing in the record as to whether any of the buildings referred to are attached to the land, so as to become a part thereof, yet, considering the sizes of some of the buildings described in the mortgage, it may well be assumed, in the absence of other considerations, that some of the buildings might be regarded as fixtures, and subject to the same right of property as the soil itself; but it is expressly provided in the permit that the

permittee may remove the structures erected by him, even after the permit has been terminated.

It further appears that the permit was issued for the purpose of canning salmon on the premises. It is a well-settled rule that erections made under a lease or license for a temporary purpose, and not erected as permanent accessions to the freehold, but erected under an understanding that the same may be removed, and made by the tenant for his own benefit, and not in fulfillment of his obligation to his lessor, do not become a part of the freehold, but are to be regarded as personal property. Deane v. Hutchinson, 40 N. J. Eq. 83, 2 A. 292, 295; Tifft v. Horton, 53 N. Y. 377, 13 Am. Rep. 537; Menger v. Ward (Tex. Civ. App.) 28 S. W. 821, 823; 32 Cyc. p. 67, and author's note, 74.

The test as to whether erections on lands should be deemed fixtures or not is:

(1) Whether there is real or constructive annexation to the realty.

(2) The appropriation or adaption to that part of the realty to which such erection is attached.

(3) Whether it was the intention of the party making the annexation that the structure be a permanent annexation to the freehold.

It is the modern doctrine that the intention of the parties is to be determined from these three tests, which establish whether property attached to the soil should be considered as part of the real estate, or as personal property. Where, as between tenant and landlord, there is an agreement that the structures erected on the land may be removed by the tenant at the expiration of his term of lease, it will be considered that such erections are personalty.

In this case, from the agreement that the structures erected may be removed, and the construction of the buildings for purposes of trade, it is evident that the intention of the parties to the permit was that the buildings erected on the land should not be a part of the freehold; therefore the structures erected on the land embraced in the permit and the machinery attached to the buildings should be considered personal property, and were lawfully sold as such. See In re Welch (D. C.) 108 F. 367.

The movant, Nissly, however, contends that a portion of the property sold was below the line of ordinary high tide, and be-

7 A.R.—10

yond the limits of the land comprised in the permit issued by the Forest Service, and that these structures, and especially the dock and any structures on the dock, should have been sold as real property.

The land below mean high tide is land held by the United States in reserve for the benefit of the future state, and while it may be disposed of by Congress under grant, it is not within the general classification of public lands of the United States. While reserved for the benefit of the future state, it has always been the policy of the government to permit such lands to be occupied for the purpose of trade, commerce, and navigation. There is, therefore, an implied license by the United States to occupy such lands for the purposes aforesaid, but this license is revocable at the pleasure of the government, and such occupancy gives no right or estate in and to the lands themselves. The occupant occupies the land at the will of the government, and at the will of the United States he will become a mere trespasser and may be removed without notice.

It does not appear how the dock was constructed, whether as a permanent structure or of temporary character, or whether any of the buildings mentioned in the mortgage were situated below the line of ordinary high tide and without the premises described in the permit. In fact, the description in the mortgages places the cannery, the dock, and all the warehouses and buildings as "situated on the above-described real estate"—that is, on the tract of land included in the permit.

If the dock is without the tract of land included in the Forest Service permit, and in or upon the tide lands and water of Tenakee Inlet, it was placed there by the Standard Salmon Packers, Inc., as a part of the adjoining plant for the purpose of canning and exporting salmon, under an implied license from the United States, holding the land in trust for the future state. The dock would be in the nature of a trade fixture, erected for the purpose of carrying on the business of canning salmon, and the United States at any time, through its proper executive officers, might cause the structures to be removed; but, having impliedly consented to the erection of the dock and the buildings thereon for the purpose stated, an agreement that such structures might be removed by the person erecting the same is implied. See Wiggins Ferry Co. v. O. & M. Ry., 142 U. S. 396, 415, 12 S. Ct. 188, 35 L. Ed. 1055; Deering v. Ladd (C. C.) 22 F. 575.

The dock, having been erected on land and over waters (held in trust by the United States and reserved for the benefit of the future state) the Standard Salmon Packers under an implied license from the United States for the purpose of trade, is not a part of the real estate, since there is an implied agreement by the United States that such structures may be removed at the will of the temporary occupant of the site. See 26 Cyc. p. 679, § 43, and authorities cited, note 50.

I conclude, in the absence of any evidence to the contrary, that the buildings, structures, machinery, and other articles mentioned in the mortgage and decree of foreclosure are personal property; that the United States marshal under the special execution of November 25, 1921, properly sold the same as personal property; and that as, according to his return, the property was offered in separate parcels with no bidders, the marshal was authorized to sell all the property as personal property in one parcel.

The motion to set aside the judgment and the motion to vacate the sale will therefore be denied.